**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------- X

RAUL DE LA CRUZ,

                                     Plaintiff,

                  -against-

CITY OF NEW YORK; ERIC ADAMS; EDWARD A. CABAN; KEECHANT L. SEWELL; NYPD POLICE OFFICER DEREK BERNARD; in his official and individual capacities; and NYPD POLICE OFFICER NICHOLAS TRUPIA, in his official and individual capacities,

                               Defendants.

--------------------------------------------------------------------- X

No. 24-cv-02289 (ALC)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

       PLAINTIFF RAUL DE LA CRUZ, by his attorneys, Beldock Levine & Hoffman LLP and New York Lawyers for the Public Interest, as and for his Complaint, alleges as follows:

## PRELIMINARY STATEMENT

       1.     This is a civil rights action brought by Raul de la Cruz ("Mr. de la Cruz"), who was shot and nearly killed by New York City Police Department ("NYPD") Officers Defendant Derek Bernard and Defendant Nicholas Trupia, on March 26, 2023 in front of his family's apartment building in the Bronx.

       2.     Mr. de la Cruz, who has schizophrenia, was visiting his family when his father, Santo de la Cruz, became concerned about Mr. de la Cruz's mental state. His father called 311 and explained to the operator via a Spanish interpreter that his son had a mental illness, was having a mental health crisis, and needed help. Santo de la Cruz noted that his son felt persecuted. In fact, Mr. de la Cruz was afraid that he was going to be tortured and killed by the police.

       3.     Instead of sending trained health professionals to help Mr. de la Cruz, NYPD patrol officers were dispatched to the scene and arrived minutes later. Defendant Officer Bernard and

Defendant Officer Trupia did not speak Spanish and were thus unable to communicate with Mr. de la Cruz or his father. They made no meaningful attempt to de-escalate the situation or Mr. de la Cruz's symptoms of mental health crisis, which included Mr. de la Cruz holding a small kitchen knife, as he felt trapped and endangered. The officers did not speak to Mr. de la Cruz in a calm tone, give him time and space for his symptoms to dissipate, or request a qualified health professional to assess his needs or to assist. Although the distance between Mr. de la Cruz was substantial, the officers opened fire on him within moments of encountering him, shooting him multiple times.

4.    Mr. de la Cruz was taken to the hospital in handcuffs and in critical condition. Doctors told his family that he had an extremely slim chance of survival. Mr. de la Cruz defied the odds and survived, but suffered and continues to suffer from permanent physical injuries and trauma.

5.    The fact that Mr. de la Cruz is alive today is nothing short of miraculous. The injuries he sustained from multiple gunshot wounds were so extensive that he nearly died. Even after his initial stabilization, transfusions, and surgeries, he was at high risk of life-threatening complications. He remained in critical condition for much of his hospital stay which extended over a month. As a result of the shooting, Mr. de la Cruz now has extensive physical disabilities and will undoubtably also continue to experience long-term psychological effects of the trauma.

6.    What happened to Mr. de la Cruz is yet another in a long series of dire incidents resulting from the City of New York's policy and practice of sending police officers to address mental health crises. This approach is ineffective. Experts across the country, as well as the United States Department of Justice, have concluded that relying on police to address mental health crises is more likely to exacerbate than alleviate mental health issues and result in harm to people who

are in need. Indeed, since 2015, at least twenty people have been killed by the NYPD while experiencing a mental health crisis, including one young man as recently as last week.

7.      The City's policy and practice of sending police officers to address mental health crises is not only ineffective, but also unlawful because it denies people with mental disabilities the benefits of the City's emergency response programs and services and fails to provide them equal access to those services.

8.      As a result, Plaintiff seeks an injunction to prohibit the Defendant City of New York from continuing to enforce its current police-run mental health crisis response policy.

9.      Despite the myriad civil rights violations suffered by those with mental disabilities at the hands of the police, and despite the desperate need for reform, New York City has continued to use police officers as first responders to mental health crises. This case is part of a pattern of cases filed nationwide challenging the harmful policies and practices of police as first responders to individuals experiencing mental health crises, including *Bread for the City v. District of Columbia*, 1:23-cv-01945-ACR, and *Disability Rights Oregon v. Washington County, et al.*, 3:24-cv-00235-SB.

10.      Mr. de la Cruz brings this action against Defendants CITY OF NEW YORK, ERIC ADAMS, EDWARD A. CABAN, KEECHANT L. SEWELL, NYPD OFFICER DEREK BERNARD, and NYPD OFFICER NICHOLAS TRUPIA, pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983), the Americans with Disabilities Act (42 U.S.C. § 12132 *et seq.*) ("ADA"), Section 504 of the Rehabilitation Act (29 U.S.C. § 794) ("Section 504"), Title VI of the Civil Rights Act of 1962 (42 U.S.C. § 2000d *et seq.*) ("Title VI"), the Fourth and Fourteenth Amendments of the United States Constitution, the New York State Constitution, New York

Common Law, the New York State Human Rights Law (N.Y. Exec. Law § 290 *et seq.*), and the New York City Human Rights Law (N.Y.C. Admin. Code § 8-101 *et seq.*).

11.     Plaintiff seeks (i) compensatory damages for physical injury, psychological and emotional distress, and financial loss caused by the illegal actions of the defendants; (ii) punitive damages to deter such intentional and reckless deviations from well-settled constitutional law; (iii) injunctive and declaratory relief; and (iv) such other and further relief, including costs and attorneys' fees, as this Court deems equitable and just.

## JURISDICTION

12.     Jurisdiction is conferred on this Court under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

13.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

14.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 to hear Plaintiff's state law claims.

## VENUE

15.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), as at least one of the Defendants resides in this district, and the acts alleged herein were committed within this district.

## JURY DEMAND

16.     Plaintiff demands a trial by jury in this action on each and every one of his claims for which a jury trial is legally available.

## PARTIES

17.     At all times relevant hereto, Plaintiff Raul de la Cruz was a resident of the State of New York, County of Bronx, City of New York. He has mental impairments including schizophrenia and is a qualified individual with a disability within the meaning of the ADA, Section 504, and the State and City Human Rights Laws. He was born in the Dominican Republic and has limited English proficiency as a result of his national origin.

18.     Defendant City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a police department, and does maintain the NYPD, which acts as its agent in the area of law enforcement and other matters and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

19.     Defendant Eric Adams was and is the Mayor of New York City from January 1, 2022 through the present.[1] As Mayor, Defendant Adams is an elected official and the chief executive officer of the City, and has final authority to appoint and/or remove the New York City Police Commissioner. He is sued individually and in his official capacity.

20.      Defendant Edward A. Caban was and is the Police Commissioner of the NYPD from July 17, 2023 to present. As Police Commissioner, Defendant Caban personally and/or through his authorized delegates, has final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties.

---

[1] Per Section 8 of the City Charter "[t]he mayor shall be responsible for the effectiveness and integrity of city government operations and shall establish and maintain such policies and procedures as are necessary and appropriate to accomplish this responsibility. . . ." N.Y.C. Admin. Code & Charter, Ch. 8.

Defendant Caban is a city policymaker for whom the City is liable. He is sued individually and in his official capacity.

21.     Defendant Keechant L. Sewell was the Police Commissioner of the NYPD from January 1, 2022 to July 16, 2023. As Police Commissioner, Defendant Sewell personally and/or through her authorized delegates, had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties. Defendant Sewell was a city policymaker for whom the City is liable. She is sued individually and in her official capacity.

22.     Defendant Police Officer Derek Bernard, Shield No. 21066, is a NYPD officer operating out of the 52nd Precinct who unlawfully used excessive force against, failed to accommodate, and/or otherwise discriminated against Plaintiff on the basis of his disability in violation of law, and nearly killed Mr. de la Cruz. He is sued individually and in his official capacity.

23.     Defendant Nicholas Trupia, Shield No. 21356, is a NYPD officer operating out of the 52nd Precinct who unlawfully used excessive force against, failed to accommodate, and/or otherwise discriminated against Plaintiff on the basis of his disability in violation of law, and nearly killed Mr. de la Cruz. He is sued individually and in his official capacity.

24.     At all times relevant herein, Defendants Adams, Caban, Sewell, and NYPD Police Officer Bernard and NYPD Officer Trupia have acted under color of law and within their authority as employees, officers, and/or agents of the NYPD and/or the City of New York.

**COMPLIANCE WITH NEW YORK'S GENERAL MUNICIPAL LAW**

25.     Plaintiff timely served a Notice of Claim upon the City of New York.

26.     Plaintiff attended a hearing pursuant to Section 50-h of New York's General Municipal Law on October 18, 2023.

27.     More than thirty days have elapsed since Plaintiff served a Notice of Claim and the City has not offered adjustment or payment thereof.

## STATEMENT OF FACTS

28.     Mr. de la Cruz is a 44-year-old Latino male.

29.     Born in 1980 in the Dominican Republic, Raul de la Cruz moved to New York at the age of 29 with his family.

30.     Mr. de la Cruz's formal education ended after the fifth grade. Spanish is his native language, and he has limited English proficiency.

31.     Mr. de la Cruz received a diagnosis of schizophrenia in or about 2018 when he was approximately 38 years old. He had been showing symptoms of schizophrenia since at least 2014.

32.     Mr. de la Cruz's mother has also been diagnosed with schizophrenia.

33.     Schizophrenia, as explained by the United States Department of Health and Human Services Office of Substance Abuse and Mental Health Services Administration ("SAMHSA"), is a "serious brain disorder that causes people to interpret reality abnormally."  It "usually involves delusions" and "paranoid thoughts" that "someone is going to cause [the person who has schizophrenia] harm." Genetic makeup and brain chemistry are thought to play a role, although no one knows what causes schizophrenia.[2]

34.     Due to symptoms of his disability, Mr. de la Cruz has historically gone through periods of time where he does not believe he has a mental disability, and he repeatedly fails to adhere to his mental health drug regimen.

---

[2]  Schizophrenia, Substance Abuse and Mental Health Services Administration, https://www.samhsa.gov/mental-health/schizophrenia.

35.     Mr. de la Cruz was hospitalized for mental health reasons in or about 2018 and 2020. Both hospitalizations resulted from police interactions.

36.     In or about 2018, Mr. de la Cruz stopped regularly taking his medication for schizophrenia. His mental health suffered greatly as a result.

37.     By March 2023, due in part to his disability, Mr. de la Cruz was struggling to maintain consistent housing. Despite this, he was working at a factory in Queens at that time.

38.     Approximately once a week, Mr. de la Cruz would go to his family's apartment in the Bronx to visit his family and bathe.

39.     Mr. de la Cruz was at his family's home on the morning of March 26, 2023 when his father, Santo de la Cruz, became concerned about his son's mental state. His family noted increasingly erratic behavior which raised their concerns about his wellbeing and safety.

40.     Mr. de la Cruz had been routinely recording videos of himself loudly criticizing the police in public spaces throughout the City, including Times Square, and had posted the videos on his social media account.

41.     Santo de la Cruz was worried that these videos, combined with the symptoms of his son's mental disability, could lead to him being targeted by the police and arrested or harmed, particularly if he went to areas of the City that are heavily policed.

42.     On the morning of March 26, 2023, Mr. de la Cruz appeared to his father to be experiencing a mental health crisis.

43.     Although at the time he did not know it was a symptom of his mental disability, Mr. de la Cruz thought he had a microchip implant on the morning of March 26th.

44.     Scared for his son's well-being, Santo de la Cruz dialed 311, the City of New York's non-police helpline, hoping to get assistance for his son before he left the property. Santo de la Cruz specifically did not call 911 as he did not want the police to respond to his call for help.

45.      Santo de la Cruz, who only speaks Spanish, was provided with a Spanish-speaking interpreter by the 311 operator.

46.     He explained that his son was having a mental health crisis and was delusional. He also explained that he hoped to get help for his son and ensure his son's safety and well-being. Santo de la Cruz stated, "We have to do something for him. That's why I'm calling [311]."

47.     Santo de la Cruz informed the operator that his son was feeling threatened and had been posting videos on social media expressing concerns about threats and persecution.

48.     Santo de la Cruz told the operator that his son carried a knife because of his delusions and fears, but never stated that he felt threatened by his son or feared for his own safety.

49.     Raul de la Cruz typically kept a small kitchen knife in his waistband or in his backpack.

50.     The 311 operator spoke with Santo de la Cruz for nearly ten minutes. During the entire call, Santo de la Cruz was simultaneously trying to stay with his son and prevent him from leaving. Each time the 311 operator offered help for his son, Santo de la Cruz responded in the affirmative, desperate for assistance for his son.

51.     Raul de la Cruz then joined the call with the 311 operator, exhibiting the delusions he was experiencing as a result of his mental health crisis. He specifically noted his concern about "the white man"—the police—coming to harm him.

52.     It was Mr. de la Cruz's belief that the police officers were going to persecute and torture him.

53.     While Raul de la Cruz was on the line, the 311 operator initiated a transfer to 911 by bringing a 911 operator on the line. The 911 operator asked Raul de la Cruz, through the same interpreter who had been on the 311 call, whether he wanted the police. His response reflected his mental state and was non-responsive. Santo de la Cruz took his phone back from his son, without knowing that the call had been transferred to 911. The 911 operator was informed by the interpreter that Raul de la Cruz was having a mental health crisis.[3]

54.     Not wanting his son to leave before help arrived, Santo de la Cruz waited outside in the front of the building for the responders to his call to 311.

55.     Internal police and/or fire department logs identify that Santo de la Cruz's call was immediately designated an "EDPC" ("Emotionally Disturbed Person" call) and police were sent to his residence in response to his plea for help for his disabled son.

56.     The 911 operator appears to have noted to dispatch that "EDP [Raul de la Cruz] has weapon," was "carrying a knife," and was "violent."

57.     Upon information and belief, the 911 operator's note that Mr. de la Cruz was "violent" had to do, at least in part, with the improper stereotype that individuals with mental disabilities are dangerous and violent.

58.     Despite Santo de la Cruz clearly stating that his son was suffering from a mental health crisis, along with Raul de la Cruz's own statements, which conveyed beliefs typical for someone experiencing schizophrenia, neither 311 nor 911 operators dispatched a non-police mental health crisis team to assist Raul de la Cruz.

_____

[3] The 311 audio produced in response to Plaintiff's open records request was cut off before the call was completed. Even fewer portions of the 911 call were produced. Plaintiff's attempts to obtain the 911 audio and body worn camera footage were rejected by the NYPD on baseless grounds, including their assertion of inability to locate responsive records. Despite withholding production of the body worn camera footage to Mr. de la Cruz, and without his knowledge or consent, the NYPD Public Information Division produced a YouTube video replaying portions of the officers' body worn camera footage and confirming the NYPD's investigation into the officers' use of force. The video was found by a reporter who shared it with Plaintiff after he filed his Complaint.

59.     Despite knowing that Santo de la Cruz and Raul de la Cruz both spoke only Spanish, the available records indicate that neither the 311 nor the 911 operators dispatched Spanish-speaking police officers to assist Raul de la Cruz.

60.     Even though Santo de la Cruz had specifically called 311 for *help* for his son, not for the police to be sent, Raul de la Cruz was provided with a police response, which was not even accompanied by health professionals.

61.     After Santo de la Cruz called 311 and spent approximately twenty minutes on the phone with the City's call operators, patiently explaining his son's mental health crisis and waiting for first responders who could help with his son's mental health crisis, it was instead NYPD Officer Bernard and NYPD Officer Trupia who arrived at Santo de la Cruz's residence. Santo de la Cruz was still on the phone with the 911 operator when they arrived.

62.     Santo de la Cruz approached the officers to explain the situation, but the officers indicated they did not speak Spanish.

63.     Despite the officers' awareness that Santo de la Cruz spoke very limited English, they continued to communicate with him in English, including about the knife that Mr. de la Cruz carried for his own safety, even as the officers observed Santo de la Cruz's meager ability to understand.

64.     Moments after, Mr. de la Cruz emerged from the front door of the building.

65.     Officers Bernard and Trupia quickly began shouting at him. Despite stating that Mr. de la Cruz spoke Spanish, their shouting was in English.

66.     Mr. de la Cruz did not understand what the officers were yelling and, frightened and experiencing delusions that the officers were there to torture him, he took the knife that he kept for his safety from his waistband and held it in front of himself.

67.    Mr. de la Cruz became increasingly terrified as the officers essentially trapped him in the recessed entryway to his building and shouted at him in a language he did not understand.

68.    Officers Bernard and Trupia did nothing to de-escalate the situation or employ any other techniques to increase safety.

69.    The officers demonstrated no evidence of being trained on how to interact with individuals with mental disabilities. For example, Officers Bernard and Trupia did not display non-threatening, inviting body language, use a calm tone or engage in active listening, assess Mr. de la Cruz's needs, attempt to de-escalate the situation, or give time and space for his symptoms to dissipate. According to police records, they also did not request an interpreter or assistance from the City's mental health crisis services.

70.    Moments later, rather than de-escalating the situation, the officers opened fire on Mr. de la Cruz, who immediately fell to the ground, bleeding profusely and losing consciousness.

71.    According to the NYPD, Officer Bernard fired two shots and Officer Trupia fired five shots.

72.    When Officers Bernard and Trupia shot Mr. de la Cruz, he was not so close to them to warrant the shooting.

73.    Upon information and belief, Defendant Officers Bernard and/or Trupia continued to shoot Mr. de la Cruz even after he fell to the ground.

74.    The police gunshots resulted in multiple, severe wounds to Mr. de la Cruz's chest, abdomen, and leg and nearly killed him. Santos de la Cruz believed that his son was dead.

75.    Upon information and belief, but for the police response to Santo de la Cruz's call to 311 for help for his son, the outcome of Mr. de la Cruz's mental health crisis would not have resulted in him being shot and nearly killed.

76.     Although the 911 operator had dispatched an ambulance along with the police, the Defendant Officers shot Mr. de la Cruz before the EMTs even arrived.

77.     After they finally stopped shooting Mr. de la Cruz, the Defendant Officers handcuffed Mr. de la Cruz while he laid unconscious on the ground.

78.     The Defendant Officers did not sustain any injuries from the incident, although an ambulance was called to tend to their "ears ringing."

79.     Upon information and belief, Defendant Officers Bernard and Trupia are not health professionals.

80.     Mr. de la Cruz was taken to St. Barnabas Hospital in the Bronx in critical condition and still handcuffed.

81.     At the hospital, doctors informed Mr. de la Cruz's family that he faced a high risk of death.

82.     Mr. de la Cruz's immediate blood loss was so massive that he was in hemorrhagic shock, a condition where a person bleeds out so rapidly that the organs are in danger of no longer receiving adequate circulation and which can quickly lead to death.

83.     The St. Barnabus Hospital trauma team quickly activated a "Massive Transfusion Protocol" during which he received dozens of units of red blood cells and numerous units of plasma, platelets, cryoprecipitate, and other blood products to manage the extensive blood loss from Mr. de la Cruz's multiple gunshot wounds.

84.     Surgeons used a technique first developed in combat settings to save the lives of military personnel suffering from life-threatening injuries, bleeding, and hemorrhagic shock.

85.     Mr. de la Cruz suffered extensive physical and psychological injuries, including to multiple internal organs and his leg.

86.     One of Mr. de la Cruz's kidneys was entirely removed, and he suffered perforated intestines. He also completely lost his spleen, multiple sections of his small and large intestines, and part of his pancreas. Doctors also repaired lacerations to multiple internal organs including his liver, stomach, diaphragm, abdominal wall, and connective tissue.

87.     A bullet also ripped through his leg, causing extensive injuries to major arteries and severely fracturing his femur. Mr. de la Cruz underwent extensive surgery with multiple surgeons to stabilize his leg and to prevent ongoing bleeding and amputation. Soft tissue damage in Mr. de la Cruz's leg caused such swelling that surgeons also had to perform an emergency procedure, making four long cuts into his leg to stop the swelling from cutting off circulation to his leg.

88.     Mr. de la Cruz spent four weeks in the Intensive Care Unit in critical condition, much of that time on a respirator, intubated, and in a medically induced coma, and in total nearly five weeks in the hospital.

89.     Mr. de la Cruz underwent multiple surgeries to repair and reconnect shattered bones, torn blood vessels, and fragmented segments of damaged intestines. At one point, he developed a serious intra-abdominal infection related to damage from his gunshot wounds. At another, Mr. de la Cruz's injuries, swelling, and surgical interventions were so extensive that surgeons needed to leave several organs disconnected and leave his abdominal cavity open, only covered with special dressings and mesh for several weeks -- due to a high risk of complications, bleeding, and infection, and because the immediate swelling became so severe that the abdominal wall simply could not be closed immediately.

90.     It would not be until April 20, 2023 that the initial incision from the first emergency surgery could be definitively closed. However, even at that time, it was impossible to reconnect his abdominal muscles, and to this day these remain disconnected. Mr. de la Cruz was ultimately

extubated and taken off the ventilator. He began to participate in physical and occupational therapy to recover from the extensive injuries and multiple surgeries, and he slowly began to eat. He also received psychiatric care and his mental health stabilized with therapy and psychiatric medications for his schizophrenia.

91.     Mr. de la Cruz was released from the hospital on April 28, 2023, with numerous scheduled follow-up medical appointments.

92.     On May 7, 2023, Mr. de la Cruz was readmitted to St. Barnabas Hospital for rectal bleeding colitis, a complication from surgery, which required re-connecting his intestines.

93.     He was again discharged on May 8, 2023, with numerous follow-up appointments scheduled.

94.     Mr. de la Cruz came home to a family devastated that they had nearly lost him.

95.     During his month-long stay in the hospital, doctors repeatedly informed Mr. de la Cruz and his family that, although lucky to be alive, he would not function the same as before.

96.     In fact, one year after the shooting Mr. de la Cruz is still not functioning well at all. His injuries are substantial. He suffers from constant and severe pain in his leg and abdomen, and he cannot lift heavy objects. Mr. de la Cruz has limited mobility and strength, and requires a cane to walk.

97.     As a result of the shooting and the trauma to his abdomen, Mr. de la Cruz is forced to wear a girdle around his torso to provide support for his internal organs. He also has to take medication for constipation so that he can go to the bathroom.

98.     As a result of having one kidney and part of his pancreas removed, Mr. de la Cruz now has diabetes.

99.     Additional surgeries are recommended to repair his abdomen and remove one bullet that remains lodged in his back, but Mr. de la Cruz is still too afraid to undergo these surgeries.

100.    Mr. de la Cruz also suffers from severe emotional distress, which he describes as pain and despair, and which results in sleeplessness and shortness of breath, as he relives the events over and over.

101.    Although prior to the shooting Mr. de la Cruz lived independently, he now lives with his family, including his sister, who is a registered nurse who works full-time.

102.    Santo de la Cruz also works full-time, supporting multiple family members, including his son Raul and Santo de la Cruz's wife, who has also been diagnosed with schizophrenia.

103.    Santo de la Cruz and Mr. de la Cruz's sister provide extensive support and routine care for Mr. de la Cruz, who relies on their care and is dependent upon them.

104.    With the support and assistance of his family, Mr. de la Cruz continues to take his prescribed psychiatric medications and participates in ongoing outpatient care, although his family has heightened concern about his mental health.

105.    Although Mr. de la Cruz would like to return to work, he has been unable to do so because of his constant pain and his mobility and strength limitations.

**The City of New York's Disparate Treatment of Individuals with Mental Disabilities Such as Raul de la Cruz**

106.    If Mr. de la Cruz had suffered a physical health crisis on March 26, 2023, the response likely would have included qualified health professionals specifically trained to assess an emergent health issue, offer on-the-spot stabilization and treatment, and, if necessary, transport to a hospital or other specialized treatment facility or health care provider.

107.    Obtaining quality emergency health care in a mental health crisis should be as appropriate, effective, and expeditious as calling for medical care in other health crises. Yet, Mr. de la Cruz's experience demonstrates that this is far from the case in New York City.

108.    When someone in New York City experiences a physical health crisis, such as a heart attack or allergic reaction, they can call for emergency help and expect a response from qualified health professionals specifically trained to assess and stabilize the condition and who will provide on-site treatment and transportation to a specialized care facility, if necessary. The EMTs and paramedics who respond to physical health emergencies require specialized training and/or certifications to deliver specialized health care that typically cannot be provided by a police officer who is not trained or certified as an EMT or paramedic.

109.    Because law enforcement officers typically are not dispatched to respond to physical health emergencies individuals experiencing such emergencies who call the City for emergency help face less risk of entanglement with the criminal justice system when they receive the emergency response services.

110.    By contrast, however, when someone in New York City experiences a mental health crisis and calls for help, the City, in large part, treats their health emergency like a crime or public safety incident, sending armed law enforcement officers who are unqualified to make critical health-related medical treatment determinations, administer stabilizing treatments, or de-escalate a mental health crisis, and, in fact, as experts have concluded, and experience in New York and elsewhere has shown, are more likely to exacerbate than resolve the crisis.

111.    Although determination of the appropriate response to a specific call for the City's assistance is a fact-specific inquiry, the response to mental health crises should be anchored in a

health-focused response, as is the case for a response to a physical health crisis, which requires the response of a health professional.

112.    In order to ensure it provides treatment to individuals experiencing a mental health crisis that is equal to the treatment it provides to individuals experiencing physical health crises, the City must provide individuals experiencing a mental health crisis with a health response, not a police response. On the other hand, when individuals experience a mental health crisis *and additionally* conduct themselves in a manner which poses a credible risk of imminent serious physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm, a police response may be warranted. In such instances, however, to ensure equal treatment, the police must "co-respond" with a team of health professionals. In this case, instead of providing Mr. de la Cruz the health care services he needed, law enforcement officers who did not even speak Spanish were sent to respond to his mental health crisis. They exacerbated, rather than alleviated, the mental health issue for which help was sought. The outcome was horrific.

113.    Prior to nearly being killed by NYPD Officers Bernard and Trupia, Mr. de la Cruz, as a symptom of his mental disability, often felt threatened and persecuted by the government, and he was particularly afraid of the police. Although Mr. de la Cruz's psychiatric symptoms of schizophrenia are currently stabilized while on medications and receiving psychiatric care, his family has increasing concerns about his mental health.

114.    Moreover, now that Mr. de la Cruz has experienced what can happen when police respond to mental health crises and/or when a person is designated by the City as an "EDP," Mr. de la Cruz lives in a constant state of fear that he may again be grievously injured by the police

while experiencing a mental health crisis or if he or someone on his behalf seeks assistance from the City for a mental health crisis.

115.    Mr. de le Cruz also lives in a constant state of fear that the City and the NYPD will forcibly hospitalize him against his will simply for being an individual with a mental disability who may appear unable to meet his basic needs.

116.    When Mr. de la Cruz experiences a schizophrenic episode, he has delusions, and his speech becomes loud, incoherent, and disorganized. He experiences paranoia about the police and the government, and he has trouble thinking and acting clearly—behavior which is likely to lead to police officers becoming suspicious of him, thereby increasing the likelihood of future risk of injury by the police.

**The City's History of NYPD Officers Shooting and Killing Individuals with Mental Disabilities and its Knowing Failure to Cease Such Unlawful Treatment**

117.    Mr. de la Cruz's horrific experience with the City's emergency response program for individuals experiencing mental health crises is yet another incident in a pattern of police responses to individuals experiencing mental health crises resulting in serious injury or death.

118.    Defendants City of New York, Mayor Adams, NYPD Commissioner Caban and former Commissioner Sewell have repeatedly had notice that sending police officers to respond to mental health crises is ineffective and harmful, based on multiple incidents of excessive force and misconduct, and other denials of rights to equal treatment and access to the benefits of services to individuals with mental disabilities or perceived mental disabilities, dating back to at least 1999.[4]

119.    Dozens of incidents have resulted in an individual with a mental disability being shot and killed by the NYPD. Examples of a few of these egregious abuses in the past two decades

---

[4] In 1999, six NYPD officers responded to a call regarding a 29-year-old man with mental disabilities who was holding a small hammer, and shot Mr. Busch twelve times, killing him instantly. *Busch v. City of N.Y.*, 224 F.R.D. 81 (E.D.N.Y. 2004).

which resulted in death are provided below. The same pattern found in many of the incidents in which NYPD officers have shot and killed individuals experiencing a mental health crisis can be found in the manner in which the NYPD officers shot Mr. de la Cruz.

a. **Khiel Coppin**: In 2007, the mother of Khiel Coppin, an 18-year-old Black man with mental disabilities, called 911 seeking assistance to help transport her son to a psychiatric hospital. Mr. Coppin, who was holding a hairbrush under his shirt, was shot and killed by NYPD officers after he attempted to escape by climbing out of his window. *Owens v. City of New York*, 183 A.D.3d 903 (App. Div. 2d Dept. 2020).

b. **Iman Morales**: In 2008, when officers responded to a request for help by the mother of Iman Morales, a Latino man who had schizophrenia and had barricaded himself in his apartment, the officers used a taser when Mr. Morales was standing on a ledge, causing him to fall to his death. *Negron v. City of N.Y.*, 976 F. Supp.2d 360 (E.D.N.Y. 2012).

c. **David Felix**: In 2015, David Felix, a 24-year-old Black man with paranoid schizophrenia, was shot and killed by two NYPD detectives who, with knowledge of Mr. Felix's mental disability, entered his apartment without a warrant, causing Mr. Felix to jump out of bed in fear and flee. The detectives pursued Mr. Felix who was unarmed and, claiming Mr. Felix had grabbed a police radio and was about to strike them, shot and killed Mr. Felix in the lobby of his apartment building. *Felix v. City of N.Y.*, 344 F. Supp. 3d 644 (S.D.N.Y. 2018); *Felix v. City of N.Y.*, 408 F. Supp. 3d 304 (S.D.N.Y. 2019), *Felix v. City of N.Y.*, No. 16-cv-5845 (AJN), 2020 U.S. Dist. LEXIS 189223 (S.D.N.Y. Oct. 13, 2020).

d. **Mario Ocasio**: Also in 2015, Mario Ocasio, a Latino man, was killed by the NYPD's excessive taser use after his girlfriend called 911 stating that he was behaving erratically. Approximately a dozen officers responded to the call. After Mr. Ocasio was in handcuffs, an officer tased him in the back, killing him.[5]

e. **Deborah Danner**: In 2016, NYPD officers shot and killed Deborah Danner, a 66-year-old Black woman with a history of schizophrenia, after officers responded to a call that a woman had been acting erratically in an apartment building. When they arrived, Ms. Danner allegedly was holding kitchen scissors. The officers alleged that she then picked up a wooden bat.[6]

In response to the NYPD officer killing Ms. Danner, then-NYPD Police Commissioner James P. O'Neill stated, "We've established procedures and

---

[5] J. David Goodman, *Family Disputes Police Account of Bronx Man's Stun Gun Death*, N.Y. Times (June 10, 2015), https://www.nytimes.com/2015/06/11/nyregion/family-disputes-police-account-of-bronx-mans-stun-gun-death-html.

[6] Derick Waller, *NYPD Sergeant Who Shot Mentally Ill Woman Found Not Guilty*, ABC 7 N.Y., (Feb, 15, 2018), https://abc7ny. com/hugh-barry-nypd-sergeant-deborah-danner-murder-trial/3087715/.

protocols for handling emotionally disturbed people. That's to keep everybody safe. . . ." He added, "It looks like some of those procedures weren't followed."[7] The NYPD sergeant who was the shooting officer faced second degree murder charges as a result of his conduct and was subsequently reportedly forced to resign.[8]

f.  **Ariel Galarza**: Also in 2016, Ariel Galarza, a 49-year-old Latino man, was killed by the NYPD after a neighbor called 911, mistakenly believing Mr. Galarza was holding a knife and acting erratically. Mr. Galarza was not in fact holding a knife when the officers arrived. Nonetheless, the officers tased him twice, alleging he was holding a Tabasco bottle above his head, and then tased him again after he fell to the ground, including in "drive-stun" mode, which resulted in his death, later deemed a "homicide" by the Medical Examiner.[9] *Galarza v. City of New York*, Index No. 28727/2017E (Bronx Supreme Court).

g.  **Dwayne Jeune:** In 2017, NYPD officers shot and killed Dwayne Jeune, a 32-year-old Black man, after his mother called 911 saying that he was acting erratically, although not violently. Officers had knowledge of Mr. Jeune from prior mental health crisis calls.[10] *Jeune v. City of New York*, Dkt. No. 501500/2018 (Bronx Supreme Court).

h.  **Miguel Richards**: Also in 2017, Miguel Richards, a college exchange student from Jamaica, was killed by NYPD officers in his Bronx apartment after his landlord asked the police to do a "wellness check" because he had not heard from Mr. Richards for a while. After a 15-minute encounter in which Mr. Richards remained motionless and silent, the officers at the scene shot Mr. Richards 16 times.[11]

i.  **Dwayne Prichett**: In 2018, Dwayne Prichett, a 48-year-old Black man, was killed by the NYPD after he was handcuffed by officers responding to his father's 911 call that his son had barricaded himself in his room. The City's medical examiner deemed Mr. Prichett's manner of death a "homicide."[12]

j.  **Susan Muller**: Also in 2018, NYPD officers shot and killed Susan Muller in her Queens home after she called 911 about an armed intruder. Ms. Muller was known

---

[7] Ashley Southall, *Officer Faces Discipline 5 Years After Killing Mentally Ill Woman*, N.Y. Times (Oct. 4, 2021), https://www.nytimes.com/2021/10/04/nyregion/nypd-killing-mental-illness.html.

[8] Rocco Parascandola, *NYPD to force resignation of sergeant who fatally shot Deborah Danner in Bronx bat incident* (Sept. 23, 2023), https://tinyurl.com/annv9mxm.

[9] Scott Heins, *Death of Unarmed Bronx Man Tasered by NYPD Ruled a Homicide*, Gothamist (April 7, 2017), https://gothamist.com/news/death-of-unarmed-bronx-man-tasered-by-nypd-ruled-a-homicide; https://ag.ny.gov/sites/default/files/galarza_report_8_30_17.pdf.

[10] Sean Piccoli & Ashley Southall, *Police Fatally Shoot 'Emotionally Disturbed' Man Holding Knife in Brooklyn*, N.Y. Times (July 31, 2017), https://www.nytimes.com/2017/07/31/nyregion/police-fatally-shoot-man-in-brooklyn.html.

[11] Ashley Southall & Joseph Goldstein, *Police Release Body Camera Footage of Shooting Death in Bronx*, N.Y. Times (Sept. 14, 2017), https://www.nytimes.com/2017/09/14/nyregion/police-body-camera-footage-new-york.html.

[12] N.Y.S. Office of the Attorney General, *Report on the Investigation into The Death of Dwayne Prichett*, https://ag.ny.gov/sites/default/files/oag_report_-_pritchett.pdf.

by the NYPD to have a mental disability, as police had previously responded to nine other 911 calls from her home since 2000.[13]

k. **Kawaski Trawick**: In 2019, Kawaski Trawick, a 32-year-old Black man with mental disabilities was in his apartment cooking when a NYPD officer pushed open the door. Mr. Trawick was holding a bread knife and later a stick. Police shot and killed him in his apartment, within less than two minutes of their arrival.[14]

l. **George Zapantis**: In 2020, George Zapantis, a 29-year-old white man with mental disabilities, was killed after being tased seven times by police in the doorway of his Queens home. Body camera footage captured Mr. Zapantis telling officers that he was not able to breathe throughout the encounter.[15] *Zapantis v. City of New York*, 1:21cv05138 (E.D.N.Y.).

m. **Eudes Pierre:** In 2021, Eudes Pierre, a 26-year-old Black man with bipolar disorder was shot ten times and killed by the police. The NYPD claimed to receive a call about a man allegedly "armed with a gun and knife." Mr. Pierre had two prior encounters with the NYPD related to mental health crises. When NYPD officers tried to confront Mr. Pierre, he fled into the subway station. NYPD officers reportedly attempted to deploy their stun guns, but ultimately shot and killed him. Officers did not find a weapon on or near Mr. Pierre.[16]

n. **Win Rozario:** On March 27, 2024, Win Rozario, a nineteen-year-old Bangladeshi, called 911 from his home in Queens, seeking help for the mental health crisis he was experiencing. With his mother standing nearby, NYPD officers arrived within minutes and tased Mr. Rozario in response to his pulling a pair of scissors from a drawer. When his mother accidentally knocked the tasers out of her son's body and he picked up the scissors again, the police shot and killed Mr. Rozario.[17]

---

[13] Ashley Southall & Nate Schweber, *The Local Precinct Knew Her Troubles, The Officers Who Shot Her Came From Another*, N.Y. Times (Sept. 18, 2018), https://www.nytimes.com/2019/09/18/nyregion/nyc-police-queens-shooting-911-call.html.

[14] Eric Umansky, *It Wasn't the First Time the NYPD Killed Someone in Crisis. For Kawaski Trawick, It Only Took 112 Seconds*, ProPublica (Dec. 4, 2020), https://www.propublica.org/article/it-wasnt-the-first-time-the-nypd-killed-someone-in-crisis-for-kawaski-trawick-it-only-took-112-seconds.

[15] Yoav Gonan, *Cops Tased Unarmed Queens Man Seven Times Before He Died, Video Shows,* The City (Aug. 11, 2020), https://www.thecity.nyc/2020/8/11/21364522/nypd-cops-tased-unarmed-queens-man-died-video-shows.

[16] Ali Watkins, *Brooklyn Man Shot by the Police Was Mentally Ill Family Says*, N.Y. Times (Dec. 23, 2021), https://www.nytimes.com/2021/12/23/nyregion/eudes-pierre-shooting-brooklyn.html.

[17] Charles Lane & Bahar Ostadan, *Police shoot and Kill 19-year-old in Queens who called police for mental help, NYPD says* (Mar. 27, 20204), https://gothamist.com/news/police-shoot-person-in-queens-now-in-critical-condition-nypd.

120.    With this most recent tragedy, since 2015 alone, at least twenty people—seventeen of whom were Black or other people of color—have been killed by police in New York City while experiencing a mental health crisis.[18]

121.    The vast majority of the NYPD officers involved in these incidents were never disciplined for their conduct.

122.    The tragedies described above are just a few of the myriad incidents that have put the City of New York on notice that the policies and procedures it follows for responding to mental health crises are ineffective and that its policies treat individuals experiencing mental health crises inferiorly and unequally to non-disabled persons and people experiencing other crises.

123.    A January 2017 Report by the New York City Department of Investigation, Office of the Inspector General for the NYPD ("OIG-NYPD"), detailed longstanding deficiencies in the NYPD's handling of responses to individuals with mental disabilities or perceived mental disabilities, and specifically highlighted deficiencies in its training,  including its failure to "systematically assign" "CIT" (crisis intervention training) trained officers to mental health crisis incidents and its failure to provide 911 call takers with specialized training.[19]

124.    Despite the findings in the OIG-NYPD Report, as well as other acknowledgements of the need for specialized training, particularly to supplement the training officers receive for responding to 911 calls, the City's efforts to improve mental health crisis response training have been woefully inadequate and ineffective. In fact, in response to yet another NYPD killing of an individual experiencing a mental health crisis, City officials who helped craft the NYPD's de-

---

[18] See Greg B. Smith, *Cops Still Handling Most Mental Health Calls Despite Efforts to Keep Them Away*, The City (Jul. 22, 2021), https://www.thecity.nyc/2021/7/22/22587983/nypd-cops-still-responding-to-most-911-mental-health-calls; NYLPI, *Saving Lives, Reducing Trauma: Removing Police from New York City's Mental Health Crisis Response*, at 2, https://www.nylpi.org/wp-content/uploads/2021/10/FINAL_Mental-Health-Crisis-Response-Report.pdf.

[19] OIG-NYPD, *Putting Training into Practice: A Review of NYPD's Approach to Handling Interactions with People in Mental Crisis* (Jan. 2017), http://www1.nyc.gov/assets/oignypd/downloads/pdf/Reports/CIT_Report_01192017.pdf.

escalation training told the press in 2020 that the NYPD had "never really committed to making it work."[20]

125.    Indeed in 2020, the NYPD's specialized mental health crisis response training program was reportedly abruptly halted with no alternatives put in place.[21]

126.    Moreover, as the NYC Office of the Public Advocate stated in its 2022 Update to its recommendations to improve the City's responses to individuals in mental health crisis: "As we have seen with the avoidable deaths of individuals in crisis,[22] having CIT-trained officers respond is not a guarantee that the situation will be deescalated. . . . [I]n order to mitigate further harm and deaths, the City should strive for mental health professionals as the default response for mental health crises rather than law enforcement."[23]

127.    Crisis Intervention Team International—a group consisting primarily of police, which developed crisis intervention team training for police over 35 years ago—now argues that a health response is the only appropriate response for a mental health crisis, as law enforcement responses often escalate—rather than de-escalate—mental health crises.[24]

---

[20] Eric Umansky, *It Wasn't the First Time the NYPD Killed Someone in Crisis. For Kawaski Trawick, It Only Took 112 Seconds*, ProPublica, Dec. 4, 2020, https://www.propublica.org/article/it-wasnt-the-first-time-the-nypd-killedsomeone-in-crisis-for-kawaski-trawick-it-only-took-112-seconds.

[21] Office of the Public Advocate, *Improving New York City's Responses to Individuals in Mental Health Crisis 2022 Update* at 7, Mental-Health-Updates-2022c-AMS8L6y_znBl.pdf.

[22] https://www.bronxda.nyc.gov/downloads/pdf/annual-reports/BronxDA-Trawick-Report.pdf.

[23] Office of the Public Advocate, *Improving New York City's Responses to Individuals in Mental Health Crisis 2022 Update* at 7, Mental-Health-Updates-2022c-AMS8L6y_znBl.pdf; *see also e.g.*, Michael S. Rogers et al., *Effectiveness of Police Crisis Intervention Training Programs*, 51 J. Am. Acad. Psych. L. 1, 1, (2019) ("There is little evidence in the peer-reviewed literature . . .that shows CIT's benefits on objective measures of arrests, officer injury, citizen injury, or use of force.").

[24] CIT International, Crisis Intervention Team (CIT) Programs: A Best Practice Guide for Transforming Community Responses to Mental Health Crises (August 2019), https://citinternational.org/bestpracticeguide. *See also Treatment Advocacy Ctr., Road Runners: The Role and Impact of Law Enforcement in Transporting Individuals with Severe Mental Illness, A National Survey* (2019), https://www.treatmentadvocacycenter.org/storage/documents/Road-Runners.pdf; Anna V. Smith, *There's Already An Alternative to Calling the Police*, High Country News (June 11, 2020),    https://www.hcn.org/issues/52.7/publichealth-theres-already-an-alternative-to-calling-the-police    ("When police show up, situations can escalate, and the use of force can be disproportionate, especially towards Black people . . .").

128.    In contrast to a health-focused response, when police officers are dispatched to mental health crises before, or instead of, qualified health professionals, people with mental disabilities are deprived of the immediate care they need. Police officers are not qualified health professionals and therefore cannot provide the care and treatment that individuals experiencing mental health crises need.

129.    Unlike training for qualified health professionals, Mr. de la Cruz's encounter with the police illustrates how training for police officers emphasizes law enforcement, which often assumes that non-compliance with police orders constitutes a threat to personal or public safety. Police officers are taught to be prepared to defend themselves from attack. For example, they attempt to deter non-compliance with orders by their authoritative tones and stances, like the conduct exhibited by Defendants Officers Bernard and Trupia, that enable their hands to be ready in case they need to use force.

130.    This type of training renders police officers especially ill-suited to interact with someone experiencing a mental health crisis, let alone to de-escalate and stabilize the situation.

131.    In fact, Mr. de la Curz's encounter with the police illustrates how a law enforcement approach exacerbates a mental health crisis. Police officers' use of aggressive tones and attempts to assert control can make a person frightened and feel stressed and anxious,[25] particularly for individuals experiencing a mental health crisis, who often endure greater trauma and fear when police respond to them.[26]

---

[25] *See  e.g.,* Substance Abuse and Mental Health Services Administration, *National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit,* at 33 (Feb. 2020) ("Unfortunately, well-intentioned law enforcement responders to a crisis call often escalate the situation solely based on the presence of police vehicles and armed officers that generate anxiety for far too many individuals in a crisis."), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.

[26] *See, e.g.,* NYLPI, *Saving Lives, Reducing Trauma, Reducing Police From New York City's Mental Health Crisis Response,* at 10-16 (2021), https://www.nylpi.org/wp-content/uploads/2021/10/FINAL_Mental-Health-Crisis-Response-Report.pdf. *See also id.* at 10 (respondents to survey of NYPD response to individuals in

132.    Moreover, an individual experiencing a mental health crisis may have difficulty complying with and/or following a police officer's commands for myriad reasons, especially not immediately, including because they may be experiencing hallucinations or delusions—as Mr. de la Cruz was experiencing on the morning of March 26, 2023—making those in crisis especially vulnerable to police use of force.[27]

133.    The Department of Justice reports that individuals with a serious mental illness "face 11.6 times the risk of experiencing a police use of force than faced by persons without a serious mental illness," and that "[i]n recent years, people with mental illness have accounted for between 20% and 25% of individuals killed by law enforcement."[28]

134.    Police-based responses to mental health crises are more likely to exacerbate than alleviate the trauma of the person in crisis, as well as lead to avoidable arrests, incarceration, and unnecessary hospitalizations.

135.    Despite the OIG-NYPD Report's findings, and the multitude of other ways in which the City has been on notice of the desperate need for reform, the City has not adequately addressed the persistent, dire, and unequal treatment of individuals experiencing mental health crises. First and Second Mayoral Task Forces—formed in June 2014 on Behavioral Health and Criminal Justice and in June 2018 on Crisis Prevention and Response, specifically to address mental health issues connected to 911 calls and their aftermath – were convened and yielded little or no impact on the City's policies and practices concerning the City's response to, and the NYPD's training and handling of, individuals experiencing mental health crises.

---

mental health crisis "described harmful experiences, including inadequate care and treatment, re-traumatization, injuries, unnecessary and inappropriate involvement in the criminal legal system, forced hospitalizations, and elevated fear and mistrust towards law enforcement.").

[27] *See* Jamelia Morgan, *Disability's Fourth Amendment*, 122 Colum. L. Rev. 489, 558-59 (2022).

[28] Department of Justice and Department of Health & Human Services Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities, at 2 (2023), https://tinyurl.com/bdene967.

136.    Recurring incidents in this City demonstrate that police-based interventions not only fail to meet mental health needs, but also expose people with mental disabilities or perceived disabilities to criminal justice contacts that often have adverse outcomes, including deadly consequences.

137.    The City's efforts at providing non-police-based alternatives to individuals experiencing mental health crises have been equally unavailing. Acknowledging that health-led, rather than police-led response options to mental health emergencies yield better outcomes, in the spring of 2021, the City launched a pilot program in certain police precincts known as B-HEARD—Behavioral Health Emergency Assistance Response Division (the "Pilot")—which promised to substitute undefined "mental health professionals" and emergency medical technicians ("EMTs") employed by New York City's Emergency Medical Services in place of police officers in response to "low acuity mental health 911 calls."[29]

138.    At the time Defendant Officer Bernard and Defendant Officer Trupia nearly killed Mr. de la Cruz, B-HEARD was only available in 15 of New York City's 77 police precincts, or fewer than 20% of the City's precincts, and it was not available in the precinct from which Santo de la Cruz called for help.[30]

139.    In addition to only being available in select precincts, the B-HEARD pilot only functions 16 hours a day in those precincts.[31] Although the City touts the Pilot as a "commitment to treat mental health emergencies as a health problem not a public safety problem" and a "health-

---

[29] B-HEARD: 911 Mental Health Emergency Alternative Response Pilot Project, Frequently Asked Questions ("B-HEARD FAQ"), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/b-heard-public-faqs-5-27-2021.pdf; B-HEARD: 911 Mental Health Emergency Response Pilot Project. https://mentalhealth.cityofnewyork.us/wp-content/uploads/2023/10/B-HEARD-One-Pager-UPDATE-October-2023_Final.pdf.

[30] B-HEARD Data Brief (FY22 Q1 &Q2), https://mentalhealth.cityofnewyork.us/wp-content/uploads/2023/05/2023_05_23-BHEARD-Data-Brief-FY23-Q1Q2-July22-Dec22.pdf.

[31] B-HEARD FAQ, *supra* n.29, at 1.

centered approach to mental health emergencies" rather than a police response, the Pilot continues to utilize the NYPD's 911 call system for all mental health crisis calls, with the NYPD's 911 operators responsible for determining which calls will be forwarded to the Pilot. Callers cannot specifically request that a Pilot team be dispatched.[32]

140.    The City has also stated that the Pilot will not be used in undefined situations "involving a weapon or imminent risk of harm to themselves or others," "situations on subway tracks," when there is a "crime in progress, or other circumstances requiring law enforcement assistance" as identified by the 911 operator, and that "NYPD officers and other emergency response resources will continue to respond as before" to those calls.[33]

141.    Despite the City's acknowledgement that deploying NYPD officers "often is not the most appropriate form of help for those experiencing a mental health emergency . . . [as it] lacks a mental health professional in the response,"[34] B-HEARD teams handle just a fraction of the mental health crisis calls to 911 in the limited areas where it operates, during the limited hours it operates, according to City data.

142.    In 2019, the City received approximately 180,000 mental health calls.[35] According to 2023 City data, only approximately 25% of mental health calls in the B-HEARD Pilot areas were responded to by B-HEARD teams, meaning that more than 75% of calls in those few pilot areas during its limited hours of operation continued to be responded to by police.[36] All other

---

[32] *Id.*; NYC Mayor's Office of Community Health, Re-imagining New York City's mental health response, https://mentalhealth.cityofnewyork.us/b-heard.
[33] *Id.*
[34] *Id.*
[35] Greg B. Smith, *NYPD's Mental Illness Response Breakdown*, Intelligencer (March 21, 2019), https://nymag.com/intelligencer/2019/03/special-report-nypds-mental-illness-response-breakdown.html.
[36] B-HEARD Data Brief (FY23 Q3 &Q4), https://mentalhealth.cityofnewyork.us/wp-content/uploads/2024/01/BHEARD-Data-Brief-FY23-Q3-Q4_2024.pdf. Other City data suggests the number of EDP "events" that resulted in a police department disposition in 2023 in the precincts where B-HEARD is available is actually closer to 90%.

calls—those during the eight hours a day that B-HEARD Pilots do not operate, and all calls in all precincts where there is no B-HEARD Pilot, are also answered by police. Assuming roughly the same number of calls as 2019, only about 6% of the overall number of mental health calls in 2023 actually received a B-HEARD response.[37]

143.    Despite continuing and frequent violent and/or deadly encounters between NYPD officers and individuals experiencing mental health crises, no changes to the Pilot or expansions of the Pilot a have been announced.

144.    The City's Pilot has a number of other significant flaws and is wholly insufficient, given the gravity of the harm experienced by individuals with mental disabilities:

> a.    B-HEARD's response time increased from 13 minutes and 41 seconds in 2021 to 14 minutes and 12 seconds in 2022 and the City did not make its response times available for 2023.  In comparison, the City's response time for other emergencies is ten minutes or less[38];
>
> b.    B-HEARD does not include, let alone center, the role of peers (individuals with lived mental health experience) in any aspect of the B-HEARD program, despite the Public Advocate's recommendation to include and center peers[39];
>
> c.    Upon information and belief, B-HEARD personnel receive limited training, none of which is experiential in nature and none of which is trauma-informed;
>
> d.    Upon information and belief there is no oversight or evaluation mechanism for the B-HEARD pilot;
>
> e.    Upon information and belief, the City has undertaken limited outreach with respect to the B-HEARD pilot; and

---

[37] *Id.*
[38] New York City Public Advocate, Improving New York City's Responses to Mental Health Crisis: 2022 Update (Nov. 16, 2022), https://advocate.nyc.gov/reports/improving-new-york-citys-responses-mental-health-crisis-2022.
[39] *Id.*

      f.     The B-HEARD pilot does not undertake any follow-up services for individuals assisted by B-HEARD teams.[40]

145.    Despite these critical flaws, and the recommendations to improve the Pilot, the Pilot has never been appropriately modified.

146.    While the Pilot is a recognition of the need for reform, its inadequacy means that police officers continue to be dispatched unnecessarily in far too many situations, thereby defeating the purpose of a program aimed to reduce police response to individuals in the City who are undergoing a mental health crisis.

147.    Similarly, in instances where there is an instance of a credible risk of imminent serious physical harm at the same time that an individual experiences a mental health crisis, the B-HEARD pilot does not provide for a co-response of police and a B-HEARD non-police team.

148.    By continuing to send NYPD officers unaccompanied by qualified health professionals to situations requiring law enforcement assistance, such as situations involving a weapon or another credible risk of imminent serious physical harm, the Pilot also fails to provide the most effective and appropriate response services to individuals in the City who are undergoing a mental health crisis, thereby continuing to put the lives of Plaintiff and other individuals who experience mental health crises and seek the assistance of the City's services at risk and failing to ensure that they receive equal access to, and the benefits of, the City's emergency response services.

---

[40] The City acknowledges the importance of including peers to provide mental health services in non-crisis situations, as well as the importance of providing follow-up services, however, these services are not available through its emergency response systems. For example, the City's "Mobile Crisis Teams" consist of "mental health clinicians *and peers*", but these teams are only available through NYC Well, which neither operates full-time nor responds in an expeditious manner. The City's "Co-Response Teams" offer post-crisis intervention services but not for people experiencing mental health crises who access the City's services through 911. *See* B-HEARD FAQ, *supra* n.29, at 4.

149.    The inadequacy of the B-HEARD Pilot stands in stark contrast to the success of programs like Oregon's Crisis Assistance Helping Out on the Streets ("CAHOOTS"). CAHOOTS provides non-coercive support services to community members with mental disabilities, including those experiencing mental health crises. Unlike B-HEARD, CAHOOTS provides a non-police response to the vast majority of the city's mental health emergency calls, providing non-police response to nearly one-fifth of the city's total 911 calls.[41] In CAHOOTS' more than 30 years of service, handling as many as 24,000 calls a year, not a single person—neither community member nor staff—has ever been seriously injured.[42]

150.    The inadequacy of the Pilot also stands in stark contrast to the Federal Government's emphasis on the importance of a coherent system to deal with mental health crises.

151.    In 2020, for example, SAMHSA, issued National Guidelines for Behavioral Health Crises Care ("SAMHSA Guidelines"), which provide the following framework for a successful community-based crisis response service that includes a co-response when a mental health crisis is accompanied by a credible threat of imminent harm:

> [I]f the person ... indicates that he or she poses an imminent threat of harm, the mobile crisis team should coordinate with emergency responders. The mobile crisis team can meet emergency responders at the site of the crisis and work together to resolve the situation.[43]

152.    Other jurisdictions have successfully implemented crisis response programs that include a co-response for mental health crisis calls that additionally pose a credible risk of imminent serious physical harm. For example, Durham, North Carolina's "HEART" (Holistic

---

[41] *What is CAHOOTS?*, White Bird Clinic (Oct. 29, 2020), https://whitebirdclinic.org/what-is-cahoots/.

[42] Ari Shapiro, `*CAHOOTS': How Social Workers and Police Share Responsibilities in Eugene, OR*, NPR (June 10, 2020), https://www.npr.org/2020/06/10/874339977/cahoots-how-social-workers-and-police-share-responsibilities-in-eugene-oregon.

[43] Substance Abuse and Mental Health Services Administration, *National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit*, at 20 (Feb. 2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.

Empathetic Assistance Response Team) program pairs licensed mental health clinicians with police officers for 911 calls where there is an increased risk of violence and/or a weapon is present. While still in a pilot phase, Durham's transparent data-reporting shows its success to date: from July 2022 – February 2024, HEART responded to 13,528 mental health calls and dispatched co-response teams to 2,764 calls, which resulted in approximately 12% transports to care (of the calls on which the team actually made contact with the person needing assistance) and no reported serious injuries or deaths.[44]

153.    Absent real reform, the City will continue to mistreat, mishandle, and discriminate against people with mental disabilities or perceived mental disabilities throughout the city, including under the Pilot, through the continued use of other harmful and discriminatory policies and practices as described herein.

154.    The City's other harmful and discriminatory policies and practices include the "Mentally Ill or Emotionally Disturbed Persons" ("EDP") policy in the NYPD's Patrol Guide § 221-13 and the "Involuntary Removal Policy" announced by Defendant Mayor Adams on November 29, 2022 to expanding the "EDP" Policy and allow, *inter alia*, the arrest, forcible detention and involuntary transport for psychiatric evaluation of individuals who "exhibit signs of mental illness" and present a danger to self or inability to care for oneself based upon the scantest of information such as exhibiting an inability to meet "basic needs," lack of awareness of surroundings or signs of delusion—without any indication that they had committed or will commit a dangerous act or that they present a danger of serious harm to themselves or anyone else.  *See Baerga v. City of New York et al.*, 1:21-cv-05762 (LAP).

---

[44] Information and data collected from the City of Durham's Community Safety website pages regarding its HEART program, *see* https://tinyurl.com/3axwmsvw.

155.    Moreover, calling a supervisor to the scene, establishing a zone of safety, isolating and containing individuals, and following other directions in the NYPD's "EDP" Policy, Section 221-13 of the NYPD Patrol Guide, even when adhered to, has not ended unlawful arrest, police excessive force, or the unequal treatment of people with mental disabilities or perceived disabilities in response to "EDP" calls, and has, instead, led to more deaths at the hands of police including some of the incidents described above.

156.    Mr. de la Cruz's situation highlights the ineffectiveness and inadequacy of the City's mental health crisis response systems, including:

a.    the unavailability of a peer-run non-police mental health crisis response;

b.    the unavailability of a police and peer led response team to co-respond to a mental health crisis that additionally involves a credible risk of imminent serious physical harm;

c.    inadequate communication between the City's 311 general help hotline and the 911 emergency hotline;

d.    inadequate communication between 911's emergency hotline and the police;

e.    the lack of appropriate communication about crucial circumstances, including language access needs and requirements, mental health diagnoses, and paranoia related to the police;

f.    the failure to involve peers in crisis response;

g.    the limited and ineffective training of first responders; and

h.    the failure to provide follow-up services for individuals assisted by first responders.

157.    The City's failure to provide individuals with mental disabilities with appropriate and effective responses to mental health crises violates the rights of such individuals by failing to afford them equal opportunity to obtain the same benefits as provided to others.

**The United States Department of Health and Human Services and the United States Department of Justice Have Concluded that Law Enforcement-Led Responses to People Experiencing Mental Health Crises Cause Extensive Harm and Deny People with Mental Disabilities their Rights Under the Americans with Disabilities Act**

158.    Significantly, the SAMHSA Guidelines note that,

In many communities, the absence of sufficient and well-integrated mental health crisis care has made local law enforcement the de facto mental health mobile crisis system. This is unacceptable and unsafe. . . . Unfortunately, well-intentioned law enforcement responders to a crisis call often escalate the situation solely based on the presence of police vehicles and armed officers that generate anxiety for far too many individuals in a crisis.[45]

159.    In 2023, the Department of Justice--the entity charged with interpreting and enforcing the ADA, *see* 28 C.F.R. 35.190(b)(6)--and the Department of Health and Human Services released a document entitled "Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities" ("DOJ-HHS Guidance"), which explains that the Americans with Disabilities Act applies to public entities' emergency response and law enforcement systems and that the ADA's guarantee of equal opportunity for individuals with disabilities "requires that people with behavioral health disabilities receive a health response in circumstances where others would receive a health response—for example, if call centers would dispatch an ambulance or medic rather than law enforcement to respond to a person experiencing a heart attack or a diabetic crisis, equal opportunity would entail dispatching a health response in similar circumstances involving a person with a behavioral health disability."[46]

160.    The DOH-HHS Guidance further explains that the ADA's guarantee of equal opportunity for individuals with mental disabilities means that emergency dispatchers should send

---

[45] Substance Abuse and Mental Health Services Administration, *National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit 33* (Feb. 2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.
[46] *See* Department of Justice and Department of Health & Human Services, Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities 3-4 (2023) (citing 28 C.F.R. 35.130(b)(1(ii), (iii)), https://tinyurl.com/bdene967.

a mobile crisis team or other responder rather than law enforcement when a call involves a person with a mental disability and there is no need for a law enforcement response. Where a police response is called for, dispatching a co-response team that includes a health care specialist with "crisis training" would constitute a reasonable modification.[47]

161.    In its 2023 reports on investigations into the Minneapolis and Louisville police departments, the Department of Justice similarly concluded that "a law enforcement-led response can cause real harm in the form of trauma, injury, and death to people experiencing behavioral health issues, as well as other impacts." The Department of Justice further concluded that these police departments engaged in patterns and practices of discrimination that violate the Americans with Disabilities Act guarantee of 'equal opportunity' for individuals with disabilities.[48]

162.    The Department of Justice explained that the ADA requires a city and its police department to make reasonable modifications to avoid discrimination against people with mental disabilities, such as creating and expanding a first-responder entity staffed by health professionals. If a public safety concern is presented in a mental health call, that would "require a *joint* response involving police and behavioral health responders."[49]

163.    The Department of Justice has filed a "Statement of Interest" in cases involving police response to, and treatment of, individuals with mental disabilities, including *Estate of LeRoux v. Montgomery County, MD*, 8:22-cv-00856-AAQ (D. Md 2022), brought by the parents of a young Black man with mental disabilities who was killed in July 2021 when the Montgomery

---

[47] *Id. at* 4.

[48] United States Department of Justice Civil Rights Division and United States Attorney's Office District of Minnesota Civil Division, Investigation of the City of Minneapolis and the Minneapolis Police Department at 57 (June 16, 2023), https://www.justice.gov/opa/press-release/file/1587661/download ("DOJ Minn."); United States Department of Justice Civil Rights Division and United States Attorney's Office Western District of Kentucky Civil Division, Investigation of the Louisville Metro Police Department and the Louisville Metro Government at 59-60 (March 8, 2023), https://www.justice.gov/opa/press-release/file/1573011/download.

[49] DOJ Minn. at 58 (emphasis added).

County Police Department, after responding to a 911 call that he was "acting crazy," fired 23 bullets at him while he was in a parking lot. The Department of Justice explained its interest in the litigation in advancing the ADA's implementing regulations which mandate that    entities act affirmatively to ensure that people with disabilities have meaningful access to programs and services, including emergency response and law enforcement services, and requiring officers and other law enforcement agencies, such as 911 dispatchers, to make reasonable modifications to avoid discrimination on the basis of disability.[50]

164.    Most recently, the Department of Justice filed a Statement of Interest in *Bread for the City v. District of Columbia*, 1:23-cv-01945--ACR, which alleges that the District of Columbia's reliance on police officers as the default responders to mental health emergencies violates the ADA. The statement explains, *inter alia*, how reliance on less effective, potentially harmful, police responses for people experiencing mental health emergencies may deprive people with mental disabilities of an equal opportunity to benefit from a critical public service.[51] *See also Amicus Brief on Behalf of Mental Health America, et al.*, 1:23-cv-01945(ACR) [Doc. #51] (expert analyses demonstrating harmfulness of police response to people experiencing mental health crises).

165.    The Department of Justice's conclusions regarding the scope of the ADA's guarantee of equal access to police and emergency response services, and its requirement to make reasonable accommodations for people with mental disabilities is at the heart of the issues in this case. The City, Mayor Adams, NYPD Commissioner Caban, and former Commissioner Sewell

---

[50] *See* DOJ Statement of Interest in *Leroux v. Montgomery County*, https://www.justice.gov/d9/case-documents/attachments/2022/10/07/statement_of_interest-leroux_vs_montegomery_county_updated_0.pdf; *see also Est. of LeRoux v. Montgomery Cnty.*, 2023 U.S. Dist. LEXIS 47443, at *38, 2023 WL 2571518 (Mar. 20, 2023) (denying defendants' motion to dismiss,  noting how "the police officers needlessly escalated the situation, leading to tragedy.").

[51] *Bread for the City v. D.C.*, 1:23-cv-01945-ACR (Feb. 22, 2024), https://www.justice.gov/d9/2024-02/bread_v._dc_statement_of_interest_as_filed_in_court_on_feb._22_2024_0.pdf.

are and have been well aware that, for decades, there has been a systemic failure on the part of the City of New York to provide safe, appropriate, and immediate responses to people experiencing mental health crises in New York City. As Mr. de la Cruz's experience demonstrates, providing an appropriate response for people experiencing a mental health emergency can be a matter of life or death, with deadly and entirely avoidable consequences frequently resulting from police responses to mental health emergencies. Experts recognize that dispatching law enforcement officers to resolve mental health crises is not a tenable solution to a growing problem. Mr. de la Cruz is just one of the latest statistics, as a consequence of Defendants' policies and practices concerning "emotionally disturbed persons." Not one more death or near death of a New Yorker with a mental disability at the hands of the police can be tolerated.

### FIRST CAUSE OF ACTION
**Discrimination Based on Disability**
**Title II of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq*.**
**(Against the City of New York)**

166.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

167.    Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, states that, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

168.    A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

169.    Defendants are public entities, or employees of public entities, within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

170.    The term "disability" includes a "mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A), as well as "being regarded as having such an impairment," 42 U.S.C. § 12102(1)(C).

171.    Plaintiff has a mental impairment that substantially limits one or more of his major life activities such as thinking, communicating, working, and interacting with others. *See* 28 C.F.R. § 35.108 ("schizophrenia substantially limits brain function").

172.    A "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

173.    The City's provision of health and public safety is a service within the meaning of Title II of the ADA.

174.    The City's emergency (and non-emergency) response services, including 911 and 311—that receive information about potential emergency situations and that dispatch or facilitate the dispatch of personnel such as police, fire, mobile crisis teams, and emergency medical service personnel to respond to those situations—are services within the meaning of Title II of the ADA.

175.    The City's involvement of NYPD officers in interactions involving individuals with mental disabilities or perceived mental disabilities, the provision of mental health services, and responding to mental health crises, are programs and activities within the meaning of Title II of the ADA.

176.    Plaintiff is a qualified individual with a disability because he meets the essential eligibility requirements for the receipt of services by having resided in and/or been present in the

City of New York, and he is therefore eligible for mental health, crisis response, health, and public safety services, programs, and activities within the scope of Title II of the ADA.

177.    The ADA prohibits the City from discriminating against individuals by depriving them of equal access to, and the benefits of, health and public safety services because of their disabilities or perceived disabilities.

178.    The implementing regulations to the ADA make clear that public entities may not "provide any aid, benefit, or service" to qualified individuals in such a way "that is not equal to that afforded others," "not as effective in affording equal opportunity to obtain the same result [or] to gain the same benefit . . . as that provided to others," or "[o]therwise limit a qualified individual in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service" 28 C.F.R. § 35.130(b)(1) or rely on "methods of administration that . . . . defeat[] or substantially impair[] accomplishment" of the program's objectives,  28 C.F.R. § 35.130(b)(3).

179.    Plaintiff was discriminated against and deprived of equal access to, and the benefits of, health and public safety services because of his disability or perceived disability.

180.    Defendants discriminated against Plaintiff under the ADA by depriving him of the immediate health care he needed, and unnecessarily exposing him to a substantial risk of police use of force.

181.    By failing to routinely provide appropriate, non-police responses, such as a mobile crisis team or other qualified health professionals, and/or a co-response (i.e., police with a team of health professionals capable of providing on-site  assessment, stabilization and treatment) in situations of a credible risk of imminent serious physical harm  to mental health crises such as Mr. de la Cruz's, the City administers its emergency response services in a manner that deprives

Plaintiff equal opportunity to benefit from the City's services, and substantially impaired the ability of that system to fulfil its essential purpose of providing adequate emergency response services for mental health crises.

182.    Defendants have been deliberately indifferent to Plaintiff by reason of his disabilities, denying him the benefits of the services, programs, and activities to which he is entitled as a person with a mental disability, including, but not limited to, the right to be free of discriminatory or disparate treatment by virtue of his mental disability. As a result, Plaintiff suffered harm in violation of his rights under the ADA, 42 U.S.C. § 12132.

183.    Defendants also discriminated against Plaintiff under the ADA by not making reasonable accommodations to the known limitations of an otherwise qualified individual. 42 U.S.C. § 12112(b)(5)(A).

184.    Defendants have failed to accommodate Plaintiff by failing to provide him with a qualified health professional or other health-focused co-response services, knowing that such services are more appropriate for individuals with mental disabilities, and instead (a) escalating the interaction, including by failing to provide services in a language Plaintiff could understand and failing to employ strategies and tactics that meet the needs of individuals experiencing mental health crises, and (b) using excessive and extreme force.

185.    The City and the NYPD have also failed to take appropriate steps to (a) ensure that communications with members of the public with mental disabilities, including Plaintiff and his companion (his father) are as effective as communications with others; (b) furnish appropriate aids and services, including an interpreter, where necessary to afford individuals with disabilities, including Plaintiff, an equal opportunity to enjoy the benefits of the City's services, programs, and

activities; and (c) give primary consideration to the requests of the individual with a disability (or his companion) in determining what type of aid and service is necessary. *See* 28 C.F.R. § 35.160.

186.    By failing to routinely provide appropriate, non-police responses such as a mobile crisis team or other qualified health professionals to individuals experiencing a mental health crisis, and by failing to provide a "co-response" (i.e., police *and* a non-police response team) in situations involving a mental health crises *plus* a credible risk of imminent serious physical harm as Mr. de la Cruz experienced, the City's administration of its emergency response service has a disparate negative impact on the rights of Plaintiff and other individuals with mental disabilities to receive the immediate health care they need when experiencing a mental health crisis.

187.    The City's policies and practices as described herein have had a disparate negative impact on Plaintiff and other individuals with mental disabilities who are unable to receive appropriate responses to mental health crises.

188.    Defendants' conduct as described herein, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

189.    As a result of Defendants' discriminatory acts, Plaintiff has been harmed and will continue to suffer harm in violation of his rights under the ADA, 42 U.S.C. § 12132, and is entitled to damages, including damages to compensate for serious bodily injury, medical expenses, lost wages, psychological and emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

190.    Plaintiff is also entitled to reasonable attorneys' fees, expenses, and costs.

## SECOND CAUSE OF ACTION
**Discrimination Based on Disability**
**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**
**(Against the City of New York)**

191.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

192.    Section 504 mandates that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A program or activity includes "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1).

193.    The City receives "Federal financial assistance" within the meaning of 29 U.S.C. § 794(a).

194.    An "individual with a disability" is defined under the statute, in pertinent part, as an "individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual," 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102).

195.    A "qualified" individual with a disability means a person who meets the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity. 28 C.F.R. § 39.103.

196.    For the reasons set forth above, Plaintiff is a qualified person with a disability within the meaning of Section 504.

197.    The City's emergency (and non-emergency) response services are "program[s] or activities" within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B).

198.    Section 504 prohibits covered entitles from providing aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, are not afforded equal opportunity to obtain the same result as that provided to others, or are otherwise limited in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. Section 504 also prohibits methods of administration that defeat or substantially impair accomplishment of the program's objectives.

199.    For the reasons set forth above, Defendants' acts and omissions described herein violate the non-discrimination, equal access, and substantial impairment provisions of Section 504, and the regulations promulgated thereunder, and have resulted in injury to Plaintiff.

200.    Defendants have been deliberately indifferent to Plaintiff by reason of his mental disability, denying him the benefits of the services, programs, and activities to which he is entitled as a person with a mental disability, including, but not limited to, the right to be free of discriminatory or disparate treatment by virtue of his mental disability. As a result, Plaintiff suffered harm in violation of his rights under Section 504.

201.    Defendants also discriminated against Plaintiff under Section 504 by not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual. 28 C.F.R. § 39.130.

202.    Defendants have failed to accommodate Plaintiff by failing to provide him with a qualified health professional or other health-focused, non-police services, knowing that such services are more appropriate for individuals with mental disabilities, and instead (a) escalating the interaction, including by failing to provide services in a language Plaintiff could understand and by failing to employ strategies and tactics that meet the needs of individuals experiencing mental health crises, and (b) using excessive and extreme force.

203.     The City and the NYPD have also failed to take appropriate steps to (a) ensure that communications with members of the public with mental disabilities, including Plaintiff, are as effective as communications with others; and (b) furnish appropriate aids and services, including an interpreter, where necessary to afford an individual with a disability an equal opportunity to enjoy the benefits of the City's services, programs, and/or activities.

204.     This conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

205.     As a result of Defendants' discriminatory acts, Plaintiff has been harmed and will continue to suffer harm in violation of his rights under Section 504, and is entitled to damages, including damages to compensate for serious bodily injury, medical expenses, lost wages, psychological and emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

206.     Plaintiff is also entitled to injunctive relief and reasonable attorneys' fees, expenses, and costs.

### THIRD CAUSE OF ACTION
**Failure to Train**
**Title II of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.* and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**
**(Against the City of New York)**

207.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

208.     The ADA requires Defendant City of New York to ensure that individuals experiencing mental health crises are not deprived of equal access to, or the benefits of, health and public safety services because of their disabilities. Defendant City of New York therefore has a duty to ensure that its employees are adequately trained in how to respond to calls regarding individuals experiencing mental health crises and how to respond to such individuals, including

how to de-escalate the situations and how to reasonably accommodate persons with mental disabilities.

209.    Upon information and belief, Defendant City of New York failed to adequately train its employees, including 311 and 911 call center employees and first responders, including Defendant Officers Bernard and Trupia, on how to respond to calls regarding individuals experiencing mental health crises and how to respond to such individuals. In doing so, Defendant City of New York failed to ensure that Plaintiff was not deprived of equal access to, and the benefits of, health and public safety services because of his disability.

210.    By failing to adequately train its employees, Defendant City of New York has directly enforced, promoted, authorized, and sanctioned a *de facto* policy or custom of unequal and discriminatory treatment of (a) individuals experiencing mental health crises who seek assistance from the City and/or the NYPD, and (b) others they identify as "EDP's," including by failing to send first responders who are health professional and by instead sending police who are not qualified health professionals and thus lack adequate training in responding to individuals experiencing mental health crises and instead use standard police tactics which have the predictable result of escalating the risk of harm to persons undergoing mental health crises.

211.    Defendants City of New York, Mayor Adams, Commissioner Caban and former Commissioner Sewell have repeatedly had notice that the City was ineffective and inadequate at responding to mental health crises and inadequate at training its employees, including 311 and 911 call center employees, as well as first responders, on responding to calls regarding individuals experiencing mental health crises and how to respond to such individuals.

212.    Defendants also have repeatedly had notice that the City's responses to mental health crises, which were not comparable to the City's responses to physical health crises, were

likely to cause constitutional violations, based on multiple incidents of excessive force, false arrest, and other deprivation of rights and misconduct against individuals with mental disabilities or perceived mental disabilities, dating back at least to 1999.

213.    Upon information and belief, the NYPD continues to employ, promote, and even give additional responsibility to NYPD officers with a known history of abusive behavior towards individuals with mental disabilities or perceived mental disabilities.

214.    Defendant City of New York ratified the unsafe, unconstitutional, and otherwise unlawful treatment of individuals with mental disabilities or perceived mental disabilities by their knowledge of, participation in, and/or deliberate indifference to, such actions, as well as their failure to adequately train, discipline and/or hold misbehaving employees accountable.

215.    By these failures, Defendant City of New York has been deliberately indifferent to the rights of individuals with mental disabilities or perceived mental disabilities, and these failures and policies are the moving force behind, and the direct and proximate cause of, the constitutional violations suffered by Plaintiff as alleged herein.

216.    Appropriate, effective, and equal responses to mental health crises, adequate training of employees on responding to calls regarding individuals experiencing mental health crises, and appropriately responding to such individuals, would lead to different  conduct including: the provision of health professionals and less traumatic strategies designed to provide on-site stabilization and treatment, transportation to specialized health care facilities or other appropriate care centers, as needed, and other efforts to de-escalate and resolve situations involving individuals with mental disabilities.

217.    As a direct result of Defendant City of New York's failures and policies with respect to training, Plaintiff has been subjected to unconstitutional and discriminatory treatment,

unlawful seizure, and excessive force, and has suffered severe harm, including physical injury, psychological and emotional distress, fear, apprehension, and concern for his own safety.

218.    As a result of Defendants' failures to train, Plaintiff has been harmed and will continue to suffer harm in violation of his rights under the ADA, and he is entitled to damages, including damages to compensate for serious bodily injury, medical expenses, lost wages, psychological and emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

219.    Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless the City is enjoined from continuing NYPD's policy, practice, and/or custom of unconstitutional and discriminatory treatment of people with mental disabilities or perceived mental disabilities, and unless the City is enjoined from continuing the policies and/or customs including its failure to send qualified health, non-police responses to mental health emergencies and to appropriately train its employees on responding to calls regarding individuals experiencing mental health crises that have directly and proximately caused such constitutional and discriminatory abuses.

### FOURTH CAUSE OF ACTION
**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.***
**(Against Defendants City of New York, Adams, Caban, and Sewell)**

220.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

221.    Title VI provides "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

222.    Such protections extend to individuals who, as a result of national origin, are limited in their English proficiency (LEP).

223.    Plaintiff is limited English proficient and of foreign national origin.

224.    Defendant City of New York is a program or service that receives Federal financial assistance.

225.    Defendants Adams, Caban, and Sewell were or are responsible for the NYPD's operation.

226.    Defendants have been on clear notice of their obligation to provide equal access to limited English proficient individuals.

227.    In fact, the NYPD Language Access Plan specifically provides that, "[c]onsistent with Title VI of the Civil Rights Act of 1964, the Omnibus Crime Control and Safe Streets Act of 1968, and Local Law 30 of July 2017, it is the policy of the New York City Police Department to take reasonable steps to provide LEP and hearing-impaired persons with timely and meaningful access to the services and benefits that the Department provides to the degree practicable."

228.    Yet, Defendants deliberately failed to provide Plaintiff with language access or interpretation service access when responding to his mental health crisis.

229.    Defendants discriminated against Plaintiff under Title VI by not providing him with language access or interpretation service access when responding to his mental health crisis, for which they had sufficient and appropriate time to provide.

230.    As a result of Defendants' discriminatory acts, Plaintiff has been harmed and will continue to suffer harm in violation of his rights under Title VI, and is entitled to damages, including damages to compensate for serious bodily injury, medical expenses, lost wages,

psychological injury and emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

## FIFTH CAUSE OF ACTION
### Excessive Force
**Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution
(Against Defendant Officer Bernard and Defendant Office Trupia)**

231.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

232.    Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

233.    The types and levels of force Defendants used against Plaintiff were also unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

234.    Defendants used excessive force against Plaintiff, without making appropriate determinations about whether those uses of force were necessary, justified, or reasonable.

235.    Defendants caused substantial injury to Plaintiff through the use of excessive force.

236.    The types and levels of force Defendants used against Plaintiff were harmful and resulted in serious physical and emotional injury to Plaintiff.

237.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, city, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff. The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**SIXTH CAUSE OF ACTION**
**Violations of Fourth and Fourteenth Amendment of U.S. Constitution, *Monell v. Dept. of Social Services of the City of New York*, 42 U.S.C. § 1983**
**(Against Defendant City of New York)**

238.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

239.    Plaintiff has been injured proximately and directly by Defendants, including by being subjected to unlawful seizure and excessive force.

240.    Defendants City of New York, Mayor Adams, NYPD Commissioner Caban and former Commissioner Sewell have directly enforced, promoted, authorized, and sanctioned a *de facto* policy or custom of unequally and discriminatorily treating individuals experiencing mental health crises who seek the City's assistance, and using excessive force against individuals whom the City identifies as "EDP's," including by a) failing to send qualified health professionals and instead routinely sending only police who are not trained health professionals and thus lack the necessary skills and expertise to respond to individuals experiencing mental health crises, and b) using standard police tactics which have the predictable result of escalating the risk of harm to persons undergoing mental health crises.

241.    Defendants City of New York, Mayor Adams, NYPD Commissioner Caban, and former Commissioner Sewell have been deliberately indifferent to the rights of individuals with mental disabilities or perceived mental disabilities.

242.    Defendants City of New York, Mayor Adams, NYPD Commissioner Caban, and former Commissioner Sewell have repeatedly had notice that the NYPD was inadequate and ineffective at responding to mental health crises and likely to cause constitutional violations, based on multiple incidents of excessive force, false arrest, and other deprivations of rights and

misconduct against individuals with mental disabilities or perceived mental disabilities, dating back at least to 1999.

243.    Upon information and belief, the NYPD continues to employ, promote, and even give additional responsibility to NYPD officers with a known history of abusive behavior towards individuals with mental disabilities or perceived mental disabilities.

244.    Defendant City of New York, through Mayor Adams, NYPD Commissioner Caban and former Commissioner Sewell, ratified the unsafe, unconstitutional, and otherwise unlawful treatment of individuals with mental disabilities or perceived mental disabilities by their knowledge of, participation in, and/or deliberate indifference to, such actions, as well as their failure to adequately train, discipline, or hold misbehaving employees accountable.

245.    Defendant City of New York, through Mayor Adams, NYPD Commissioner Caban, and former Commissioner Sewell, ratified the unsafe, unconstitutional, and otherwise unlawful treatment of individuals with mental disabilities or perceived mental disabilities through a failed mental health response system, including (a) the failure to routinely provide qualified health professional, non-police responses to individuals experiencing mental health emergencies, (b) inadequate communication between the City's 311 general help hotline and the 911 emergency hotline, (c) insufficient communications between 911's emergency hotline and the police, and d) the lack of appropriate communication about, and training on, responding to individuals experiencing mental health crises, and being responsive to language access needs and requirements, among other significant factors.

246.    By these failures, Defendant City of New York, through Mayor Adams, NYPD Commissioner Caban, and former Commissioner Sewell, have been deliberately indifferent to the rights of individuals with mental disabilities or perceived mental disabilities, and these failures

and policies are the moving force behind, and the direct and proximate cause of, the constitutional violations suffered by Plaintiff as alleged herein.

247.    As a direct result of Defendant City of New York's failures and policies, Plaintiff has suffered severe harm, including physical injury, psychological and emotional distress, fear, apprehension, and concern for his own safety.

248.    Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from continuing the NYPD's policy, practice, and/or custom of unconstitutional and discriminatory treatment of people with mental disabilities or perceived mental disabilities, and unless Defendants are enjoined from continuing the policies and/or customs that have directly and proximately caused such constitutional and discriminatory abuses.

**SEVENTH CAUSE OF ACTION**
**Violations of the New York State Constitution, Article I, §§ 11 and 12**
**(Against Defendant City of New York)**

249.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

250.    The conduct of the Defendants Officer Bernard and Officer Trupia alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, invoking state power and/or authority, and as a result, Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

251.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 11 and 12 of the New York State Constitution.

252.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 11 and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

253.    As a result of the foregoing, Plaintiff was deprived of liberty, and is entitled to damages, including damages to compensate for serious bodily injury, medical expenses, lost wages, emotional distress, and pain and suffering, as well as punitive damages and pre-judgment interest.

254.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## EIGHTH CAUSE OF ACTION
### Discrimination Based on Disability and National Origin
### New York State Human Rights Law, Executive Law. § 290 *et seq*.
### (Against All Defendants)

255.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

256.    The New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(2)(a) provides, "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . because of the national origin . . . or . . . disability . . . of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ."

257.    The discriminatory practices prohibited by the NYSHRL include "a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities." N.Y. Exec. Law § 296(2)(c)(i).

258.    The term "person" in the NYSHRL includes "one or more individuals" as well as "corporations." N.Y. Exec. Law § 292(1).

259.    NYSHRL defines the term "place of public accommodation" to include "regardless of whether the owner or operator of such place is a state or local government entity. . . establishments dealing with goods or services of any kind. . . as well as . . . agencies or bureaus. . . ." N.Y. Exec. Law § 292(9).

260.    The City, including through its agency the NYPD, is a person or place of public accommodation because it provides services, facilities, accommodations, advantages, and privileges by acting in response to calls regarding individuals experiencing mental health crises, *inter alia*.

261.    The City and the NYPD's provision of health and public safety services, including the response to mental health crises, are services pursuant to the NYSHRL.

262.    The City's emergency (and non-emergency) response services, including 911 and 311—that receive information about potential emergency situations and that dispatch or facilitate the dispatch of personnel such as police, fire, mobile crisis teams, and emergency medical service personnel to respond to those situations—are services pursuant to the NYSHRL.

263.    The City's involvement of NYPD officers in interactions involving individuals with mental disabilities, the provision of health services, and responding to mental health crises, are services pursuant to the NYSHRL.

264.    Plaintiff is a qualified individual with a disability because he meets the essential eligibility requirements for the receipt of services by having resided and/or been present in the City of New York, and he is therefore eligible for mental health, crisis response, health, and public safety services of the City of New York.

265.    Plaintiff is also a qualified individual as he is limited English proficient due to his national origin.

266.    Defendants have been aware of the need for an appropriate mental health crisis response in New York City for years, but have failed to adequately remedy their policies, practices, and procedures for responding to mental health emergencies and interacting with individuals experiencing mental health crises, thereby causing continuing and repeated harm to such individuals.

267.    Through the actions described above, Defendants have denied to Plaintiff and other individuals with mental disabilities the accommodations, advantages, and privileges of emergency response services that meet their needs and the freedom to live without excessive force by law enforcement.

268.    The provision of appropriate and non-discriminatory health and public safety services constitutes a reasonable modification under the NYSHRL.

269.    Defendants have made inadequate or no reasonable modifications to allow people with mental disabilities the opportunity to receive emergency services that adequately meet their needs, and to live without unlawful law enforcement interaction.

270.    Defendants have failed to accommodate or make reasonable modifications for Plaintiff by failing to provide him with a qualified health professional or other health-focused, non-police knowing that such services are more appropriate for individuals with mental disabilities, and instead (a) escalating the interaction, including by failing to provide services in a language Plaintiff could understand and failing to employ strategies and tactics that meet the needs of individuals experiencing mental health crises, and (b) using excessive and extreme force.

271.    Plaintiff also was constructively excluded or denied from the NYPD's services on account of his inability to understand the English-speaking police officers sent to respond to his mental health crisis and on account of the NYPD's failure to provide services in Plaintiff's native language.

272.    As a direct and proximate result of Defendants' violations of the NYSHRL, Plaintiff has been injured as set forth herein.

273.    As a result of Defendants' discriminatory acts, the Plaintiff has been harmed and is entitled to damages, including damages to compensate for serious bodily injury, medical expenses, lost wages, psychological injury and emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

274.    This conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

275.    Consequently, Plaintiff is also entitled to injunctive relief.

**NINTH CAUSE OF ACTION**
**Discrimination Based on Disability and National Origin**
**New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*.**
**(Against All Defendants)**

276.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

277.    The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a) provides, "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation [b]ecause of any person's actual or perceived . . . national origin [or] . . . disability . . ., to refuse, withhold from or deny to such person the full and equal enjoyment, on

equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation . . . ."

278.     The term "person" in the NYCHRL includes "governmental bodies or agencies." N.Y.C. Admin. Code § 8-102(a).

279.     NYCHRL defines the term "place or provider of public accommodation" to include "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kinds are extended, offered, sold or otherwise made available." N.Y.C. Admin. Code § 8-102(9).

280.     The City, including through its agency the NYPD, is a person, place, or provider of public accommodation because it provides services, facilities, accommodations, advantages, and privileges by acting in response to calls regarding individuals experiencing mental health crises.

281.     The City's provision of health and public safety services, including responding to mental health crises, is a program, service, and activity pursuant to the NYCHRL.

282.     The City's emergency (and non-emergency) response services, including 911 and 311—that receive information about potential emergency situations and that dispatch or facilitate the dispatch of personnel such as police, fire, and emergency medical service personnel to respond to those situations—are programs, services, and activities pursuant to the NYCHRL.

283.     The City and the NYPD's involvement of NYPD officers in interactions involving individuals with mental disabilities, the provision of mental health services, and responding to mental health crises, are programs, services, and activities pursuant to the NYCHRL.

284.     Plaintiff is a qualified individual with a disability because he meets the essential eligibility requirements for the receipt of services by having resided and/or been present in the City

of New York, and he is therefore eligible for mental health, crisis response, health, and public safety services of the NYPD and the City of New York.

285.    Plaintiff is also a qualified individual as he is limited English proficient due to his national origin.

286.    Defendants have been aware of the need for an appropriate mental health crisis response in New York City for years, but have failed to remedy its policies and practices for responding to mental health emergencies and interacting with individuals experiencing mental health crises, thereby causing continuing and repeated harm to such individuals.

287.    Through the actions described above, Defendants have denied Plaintiff and other individuals with mental disabilities the full and equal enjoyment of their lives, on equal terms and conditions as those without mental disabilities. This includes the freedom to live without discriminatory treatment and excessive force by law enforcement, and to have equal access to the City's programs, services, and activities.

288.    The NYCHRL additionally requires that any person prohibited from discriminating under Section 8-107 on the basis of disability "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Administrative Code § 8-107(15). The term "covered entity" is defined as a person required to comply with any provision of Section 8-107, which includes Defendants under the N.Y.C. Admin. Code § 8-102(1).

289.    The provision of an appropriate and non-discriminatory health and public safety service constitutes a reasonable accommodation under the NYCHRL.

290.    Defendants have made inadequate or no reasonable accommodations to allow people with mental disabilities the opportunity to receive emergency services that adequately meet their needs and to live without unlawful law enforcement interaction.

291.    Defendants have failed to accommodate Plaintiff by failing to provide him with a qualified health professional or other  health-focused, non-police services, knowing that such services are more appropriate for individuals with mental disabilities, and instead (a) escalating the interaction including by failing to provide services in a language Plaintiff could understand, and failing to employ strategies and tactics that meet the needs of individuals experiencing mental health crises, and (b) using excessive and extreme force.

292.    Defendants' conduct also violates N.Y.C. Administrative Code § 8-107(17), which states that "an unlawful discriminatory practice . . . is established . . . [when plaintiff] demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

293.    Defendants' policies or practices as described herein have a disparate negative impact on Plaintiff and other individuals with mental disabilities and limited English proficiency who are unable to receive appropriate responses to mental health crises and appropriate health services to avoid escalating mental health crises, and to be free from excessive force.

294.    By failing to routinely provide appropriate, non-police responses, such as a mobile crisis teams or other qualified health professionals capable of providing on-site stabilization and treatment for mental health crises such as the crisis experienced by Mr. de la Cruz, the City's administration of its emergency response service has a disparate negative impact on individuals

with mental disabilities to receive the immediate health care they need and the appropriate health services to avoid a mental health crisis.

295.    Plaintiff also was constructively excluded or denied from the NYPD's services on account of his inability to understand the English-speaking police officers sent to respond to his mental health crisis and on account of the NYPD's failure to provide services in Plaintiff's native language.

296.    As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiff has been injured as set forth herein.

297.    As a result of Defendants' discriminatory acts, the Plaintiff has been harmed and is entitled to damages, including damages to compensate for serious bodily injury, medical expenses, lost wages, psychological and emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

298.    Plaintiff is also entitled to injunctive relief as Defendants' conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

### TENTH CAUSE OF ACTION
**Assault and Battery**
**(Against Defendant Officer Bernard and Defendant Officer Trupia in their individual capacities)**

299.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

300.    Defendants Officer Bernard and Officer Trupia committed assault against Plaintiff within the meaning of New York's common law by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

301.     Defendants Officer Bernard and Officer Trupia committed battery against Plaintiff within the meaning of New York's common law by intentionally harmfully and offensively physically coming into contact with Plaintiff without his consent.

302.     As a result of Defendants' conduct, Plaintiff has been harmed and is entitled to damages, including damages to compensate for serious bodily injury, medical expenses, lost wages, psychological and emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

## ELEVENTH CAUSE OF ACTION
### Negligence
### (Against Defendants Officer Bernard and Officer Trupia in their individual capacities)

303.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

304.     Defendant Officers Bernard and Trupia, by their aforementioned acts, negligently failed to use due care in the performance of their duties.

305.     Defendant Officers Bernard and Trupia, in shouting at Plaintiff, shouting at Plaintiff in a foreign language, and shooting Plaintiff, failed to perform their duties with the degree of care that a reasonably prudent and careful emergency health care first responder would have used under similar circumstances.

306.     Defendant Officers Bernard and Trupia also failed to perform their duties with the degree of care that a reasonably prudent and careful law enforcement officer would have used under similar circumstances.

307.     All of defendants' negligent acts were performed without any negligence on the part of Plaintiff.

308.    The negligence of Officers Bernard and Trupia directly and proximately caused Plaintiff's damages as alleged herein including damages to compensate for serious bodily injury, medical expenses, lost wages, psychological and emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

### TWELFTH CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**
**(against Defendants Officer Bernard and Officer Trupia in their individual capacities)**

309.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

310.    Defendants Officer Bernard and Officer Trupia owed Plaintiff the duty of care of reasonably prudent emergency responders.

311.    Defendants Officer Bernard and Officer Trupia owed Plaintiff the duty of care of reasonably prudent law enforcement officers.

312.    The negligent acts of Officer Bernard and Officer Trupia, alleged herein, directly and proximately caused Plaintiff's severe injuries.

313.    As a result of the shooting, Plaintiff suffered emotional distress.

314.    By reason of the foregoing, Officer Bernard and Officer Trupia are liable to Plaintiff for the negligent infliction of emotional distress.

315.    Plaintiff sustained the damages alleged herein, including damages to compensate for serious bodily injury, medical expenses, lost wages, psychological and emotional distress, pain and suffering, punitive damages, and pre-judgment interest, as a direct and proximate result of Defendants' negligent conduct.

## THIRTEENTH CAUSE OF ACTION
### Denial or Delay of Medical Care and/or Medication
### (Against Defendants Officer Bernard and Officer Trupia)

316.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

317.    New York Civil Rights Law § 28 provides that "[w]hen a person is under arrest or otherwise in the custody of a police officer, . . . such officer . . . shall have a duty to provide attention to the medical and mental health needs of such person, and obtain assistance and treatment of such needs for such person, which are reasonable and provided in good faith under the circumstances."

318.    Defendant Officers Bernard and Trupia denied and/or delayed providing Mr. de la Cruz reasonable, good faith medical attention while he was in custody of the individual police officer Defendants. As a result, Plaintiff suffered serious injury and significant exacerbation of his injuries.

319.    Defendants' conduct violated New York Civil Rights Law § 28 and Plaintiff is entitled to damages to compensate for serious bodily injury, medical expenses, lost wages, psychological and emotional distress, pain and suffering, punitive damages, and pre-judgment interest, as a direct and proximate result of Defendants' conduct.

## FOURTEENTH CAUSE OF ACTION
### Respondeat Superior
### (Against Defendant City of New York)

320.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

321.    At all relevant times, Defendants Officer Bernard and Officer Trupia were employed by Defendant City of New York and were acting within the scope of their employment.

322.    The City of New York is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of Officer Bernard and Officer Trupia.

## RELIEF REQUESTED

**WHEREFORE**, the Plaintiff respectfully requests that this Court:

A. Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that the City's emergency response program and services violate the ADA, Section 504 of the Rehabilitation Act, Section 1983, Title VI of the Civil Rights Act, the Fourth and Fourteenth Amendments of the United States Constitution, the New York State Constitution, New York Common Law, the New York State Human Rights Law, and the New York City Human Rights Law;

B. Grant Plaintiff permanent injunctive relief requiring that the City, within a reasonable period of time, implement and operate emergency response programs and services that provide adequate responses to mental health emergencies which are comparable to physical health emergencies, and that ensure health professionals are included in the first responders for all mental health emergencies;

C. Award Plaintiff compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

D. Award Plaintiff punitive damages against the individual defendants;

E. Award Plaintiff attorneys' fees, the costs and disbursements of this action, and pre- and post-judgment interest; and

F. Grant such other and further relief as this Court deems just and proper, including such orders as may be necessary to effectuate and implement the foregoing.

Dated: New York, New York
      April 5, 2024

BELDOCK LEVINE & HOFFMAN LLP     NEW YORK LAWYERS FOR THE
99 Park Avenue                      PUBLIC INTEREST, INC.
PH/26th Floor                       151 West 30th Street, 11th Floor
New York, New York 10016         New York, New York 10001-4017
(212) 490-0400                    (212) 244-4664

By: _____    By: /s/ _____
    Luna Droubi                        Maureen Belluscio
    Jody Yetzer                       Ruth Lowenkron